# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. File No. 07-102 (MJD/JJG) |
| Plaintiff, | |
| v. | MEMORANDUM OF LAW & ORDER |
| (1) LAFAYETTE DEANDRE VAN, a/k/a Van N. Lafayette, a/k/a Lafayette D. Van, | |
| Defendant. | |

Michael A. Dees, Assistant United States Attorney, for and on behalf of Plaintiff United States of America.

Andrea K. George, Office of the Federal Defender, for and on behalf of Defendant Lafayette Deandre Van.

The above-entitled matter comes before the Court upon Defendant's objections to the May 22, 2007 Report and Recommendation ("R & R") of United States Magistrate Judge Jeanne J. Graham.

## I.     INTRODUCTION

Pursuant to statute, the Court has conducted a de novo review of the record. 28 U.S.C. § 636(b)(1); Local Rule 72.2(b). Based on this Court's review of the record, and for the reasons articulated herein, the Court adopts in part and modifies in part the Report and Recommendation dated May 22, 2007. In addition, the Court denies Defendant's new motion to suppress a statement, a motion first proffered in his objections to the R & R.

## II.   DISCUSSION

Defendant does not object to Judge Graham's recommendation that his original motions to suppress evidence and statements [Doc. Nos. 15 & 16] be denied.  Therefore, the Court adopts the recommendation portion of the R & R without further discussion.  However, both Parties agree that there is a factual misstatement in the R & R, and the Court declines to adopt that statement.

### A.   R & R Facts

With one exception, the Parties agree with Judge Graham's recitation of the relevant facts of this case.  The Parties take issue with one sentence in Judge Graham's statement of facts. (Def. Obj. R & R at 3; Gov. Response to Def. Obj. R & R at 1-2.)  The relevant portion of Judge Graham's recitation of the facts is reproduced below.  The disputed portion is highlighted in bold text.

> BACKGROUND
>
> On the evening of November 28, 2006, several persons placed emergency calls and reported that shots had been fired in the vicinity of Fourth Street and Mendota Avenue in St. Paul. Based on tips from those callers, a police dispatcher stated that the suspect was in an apartment building at 871 Fourth Street, near the intersection where the shots were fired. The suspect was described as a black man in a white tee shirt and jeans.
>
> Several officers from the St. Paul Police Department responded to this call. Officer Mark Ross was among the first to arrive. After finding that the front door of the apartment building was locked, he crossed the street and looked into the building. Through a second floor window, he saw a black man in a white tee shirt. Ross radioed this discovery to other officers on the scene.
>
> Officer Edward O'Donnell, who entered the apartment building through a rear door, received this news. He proceeded to the second floor of the apartment building. There were four apartments on that floor, two of which faced the street. One was vacant, and O'Donnell found no one inside. **He then knocked on the door of the other apartment facing the street.** The door was answered by a black man in a white tee shirt and jeans, who

>was later identified as Lafayete Van, the defendant in this matter. Another person, a middle-aged white man, was standing behind Van. O'Donnell believed this person looked nervous and fearful.

(Doc. No. 25 at 2-3.)

The record of the suppression hearing testimony reflects that while officers were standing in the hallway after searching the vacant apartment, the door to apartment number 1 opened and Defendant was standing in the doorway. (Tr. at 13-14, 23, 29.) Officers did not knock on the door. Rather, Defendant opened the door for them, unsolicited. The R & R is modified to reflect that fact.

### B.     **Suppression Motion**

In his instant motion, Defendant asks the Court to suppress a statement he made in the hallway of the apartment building. Specifically, Defendant asserts that his statement that he had been in the apartment for three hours was made while he was in custody.

At the suppression hearing, the following exchange took place between St. Paul Police Officer Edward O'Donnell and Assistant United States Attorney Michael Dees.

> Dees:         . . . . After you checked the vacant apartment, what happened?
> O'Donnell:   Then I stayed on the second floor. The door to Apartment 1 opened, and that's when I saw the suspect standing in the doorway of Apartment Number 1.
> . . .
> O'Donnell:   I asked Mr. Van if we could come in, and Mr. Van told me it was not his apartment.
> Dees:        And then what did you do?
> O'Donnell:   I asked him whose apartment was it, and he pointed to the other guy and asked him if we could come in, and he said okay.
> Dees:        And did you go into that apartment?
> O'Donnell:   Yes.
> Dees:        Did you ask Mr. Van any questions while you were going in?
> O'Donnell:   I asked him how long he'd been there.

|  |  |
|---|---|
| Dees: | And what did he tell you? |
| O'Donnell: | He told me about three hours. |
| Dees: | And what did you do with Mr. Van at this point? |
| O'Donnell: | I had him step out in the hallway so I could talk to the other individual in the apartment. |
| . . . | |
| O'Donnell: | [After receiving the tenant's permission to search the apartment,] I walked back to the bedroom where [the tenant] told me Van had hid the gun. . . . As soon as I tried to pick up the bed to look underneath it, a small black pistol fell from underneath the pillow on to the floor. |
| Dees: | Did you seize that pistol? |
| O'Donnell: | Yes. |
| . . . | |
| Dees: | What did [the tenant] tell you? |
| O'Donnell: | He said, he doesn't own a gun, doesn't own any guns. |
| Dees: | And with the gun and this information, what did you do? |
| O'Donnell: | I told Officer Ross to – that Mr. Van was under arrest. |

(Id. at 15-16, 18.)  Federal Defender Andrea George cross-examined O'Donnell.

|  |  |
|---|---|
| George: | As you see the black man in the doorway in the white T-shirt and jeans, he fits the description that you received from dispatch from 911? |
| O'Donnell: | . . .[Y]es. |
| George: | And so you knew at that point, you had a potentially armed individual at that doorway? |
| O'Donnell: | Correct. |
| . . . | |
| George: | And good police work is to take down the individual that you are concerned about; put him down on the ground? |
| O'Donnell: | Sometimes, yes. |
| George: | All right.  And in this case, in fact, you ordered that Officer Ross take him down on the ground? |
| O'Donnell: | I don't recall that. |
| George: | And, sir, you went into the apartment then and spoke with the individual . . . |
| O'Donnell: | Correct. |
| George: | You don't know what's going on with the officers outside, but you do know they have Mr. Van? |
| O'Donnell: | Correct. |
| . . . | |
| George: | And they are doing what good officers do with an armed suspect? |

| | |
|---|---|
| O'Donnell: | He was placed in a squad car. |
| George: | All right. But before he was placed in the squad car, he was placed down on the ground in the hallway, right, down on the floor? |
| O'Donnell: | That's very possible, yes. |
| George: | He was searched? |
| O'Donnell: | Yes. |
| George: | Because that's police procedure, right? |
| O'Donnell: | Depending on the situation, yes. |
| George: | And certainly an armed individual where shots had been fired is going to be searched, right? |
| O'Donnell: | Correct. |
| George: | Handcuffed? |
| O'Donnell: | Correct. |
| George: | And all of the police officers there at that point were armed? |
| O'Donnell: | Correct. |
| George: | Probably had their guns out? |
| O'Donnell: | Correct. |
| George: | All right. And it was then, sir, that you went in and talked to – the individual in Apartment 1, right? |
| O'Donnell: | Correct. |
| George: | And it was actually in the hallway – it is actually in the hallway when Mr Van is on the ground handcuffed and surrounded by police officers that have their guns out, that you had the conversation with him about how long he had been at the apartment? |
| O'Donnell: | If he was taken to the ground, it would have been in the apartment where it was just myself and Officer Hall, I think. He would have been handcuffed in there or maybe just removed from there once we know [sic] he didn't have any weapons, handed off to Officer Ross in the hallway. |
| George: | And the conversation that you had with Mr. Van about how long he had been in the apartment was when he was handcuffed, surrounded by officers with guns drawn? |
| O'Donnell: | No, I believe it was immediately after I asked him whose apartment it was, and then he told me – |
| George: | Are you sure about that? |
| O'Donnell: | I'm fairly certain, yes. |
| . . . | |
| George: | You're aware, of course, in [his] search warrant, [Officer Flenniken] indicated that officers questioned Van out in the hallway? |
| O'Donnell: | He wasn't present the night we arrested Van. |

5

(Id. at 23-28.) On re-direct examination, Dees asked O'Donnell the following questions.

| | |
|---|---|
| Dees: | . . . I want to be perfectly clear. When . . . did you have the conversation with Mr. Van? |
| O'Donnell: | When the door opened. |
| Dees: | . . . What was [sic] the questions you asked him? |
| O'Donnell: | I asked him if it was his apartment, he said no. I asked him, how long he'd been there, and he said about three hours. |
| Dees: | Okay. And at that point, what did you do with Mr. Van? |
| O'Donnell: | I had him removed to the hallway. |
| . . . | |
| Dees: | When was Mr. Van removed from the apartment? |
| O'Donnell: | As soon as we determined it was not his apartment. |

(Id. at 29.) On re-cross, George and O'Donnell had the following exchange:

| | |
|---|---|
| George: | Officer, you testified on cross-examination that when you went into the apartment, you put Mr. Van on the floor and handcuffed him. |
| . . . | |
| O'Donnell: | I don't believe I handcuffed him. |
| George: | Immediately when you went into the apartment, you put him on the floor? |
| O'Donnell: | Yeah, I really don't recall if we did immediately or stepped in and talked to him first and then put him to the floor. |
| George: | And you had your gun drawn at that time? |
| O'Donnell: | I probably did. |
| . . . | |
| O'Donnell: | I don't recall if I had it out at the time. |
| George: | And every officer behind you was armed as well? |
| O'Donnell: | They are always armed, yes. |
| George: | Always. And in a situation that is dangerous and potentially volatile, you have your guns out? |
| O'Donnell: | Sometimes, yes. |
| George: | And so then you put him on the ground and then you brought him outside and put him down in the hallway? |
| O'Donnell: | That sounds, correct, yes. |
| George: | All right. And it was the questioning that occurred during the course of those events? |

    O'Donnell:    The conversation I had with Mr. Van was in the apartment, not in the hallway.

(Id. at 30-32.)  St. Paul police officer Mark Ross testified that when he arrived at the scene, other officers were already there, Defendant was in the hallway, and O'Donnell told him to detain Defendant.  Ross did so by handcuffing Defendant, pat searching him, and placing him in a squad car.  (Id. at 39.)

In a custodial situation, law enforcement officers must provide warnings to reduce the risk that a defendant will be coerced into incriminating himself.  See New York v. Quarles, 467 U.S. 649, 654 (1984); Miranda v. Arizona, 384 U.S. 436, 460-61 (1966).  A defendant is in custody when he is deprived of "freedom of action in any significant way."  Id. at 444.  When considering whether a defendant's statements are coerced, courts must not only consider statements made by law enforcement, but also conduct that rises to the level of the "functional equivalent" of direct questioning.  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  The functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Id. at 301.

Defendant argues that his statement that he had been in the apartment for three hours was obtained in violation of his Fifth Amendment rights against self-incrimination since he was in a custodial situation at the time, and was not given a Miranda warning prior to giving the statement.

The Court finds that Defendant was not in custody when he said he had been in the apartment for three hours.  During the suppression hearing, Officer O'Donnell was asked the

same question regarding Defendant's "three hour" statement in several different ways. The Court finds that O'Donnell's statements at the suppression hearing, although not identical, were consistent and credible that Defendant was not in custody when asked how long he had been in apartment number 1.

Defendant seems to put much stock in any time lapse that might have occurred between O'Donnell asking Defendant if the apartment was his and asking how long Defendant had been in the apartment. However, there does not appear to be any time lapse between these questions. Moreover, reading the testimony as a whole, O'Donnell conflates the two questions, and the Court finds that when O'Donnell testified that he did not remove Defendant or put Defendant on the floor until after he determined Defendant did not live in the apartment, he meant that he did not do these things until after asking both questions. Thus, O'Donnell's testimony that he had the conversation with Defendant when Defendant opened the door and when he was entering apartment number 1 is credible. There is no evidence to support a finding that Defendant was on the ground before O'Donnell asked him how long he had been in apartment number 1.

At one point, O'Donnell testified, "I don't remember if we [put Defendant on the ground] immediately or stepped in and talked to him first." However, O'Donnell's other testimony supports the conclusion that O'Donnell talked to Defendant first, and then either put Defendant on the ground, or had someone in the hallway do so.

O'Donnell testified that he did not have his conversation with Defendant when Defendant was handcuffed and surrounded by officers with guns drawn, but rather immediately after he asked Defendant whose apartment it was, when the apartment door was

first opened. O'Donnell also testified that he asked Defendant how long he had been in the apartment as he was "going in" the apartment, and that once he asked Defendant if it was his apartment and how long he had been in the apartment, he asked Defendant to "step out" in the hallway, something someone who had been forced down to the ground could not do.

In addition, O'Donnell testified that if Defendant had been taken to the ground in the apartment, "[h]e would have been handcuffed in there or maybe just removed from there once we know he didn't have any weapons, handed off to Officer Ross in the hallway." Defendant clearly was not handcuffed before being "handed off" to Officer Ross because Ross testified that he handcuffed Defendant after O'Donnell told him to detain Defendant.

Defendant was standing in the doorway that he had voluntarily opened when O'Donnell asked him how long he had been in the apartment. At that point, O'Donnell was not deprived of his freedom of action in any significant way. Moreover, O'Donnell's non-intrusive questions about the ownership of the apartment after Defendant said he did not live there, and his question about the length of time Defendant had been in the apartment, were not the types of questions posited to solicit incriminating evidence, and thus were not the functional equivalent of interrogation.

Although O'Donnell testified that he might have had his gun drawn when he spoke with Defendant, there is no evidence that he had it pointed at Defendant or that he used his gun as part of any show of force against Defendant, if indeed he even had his gun out at the time. Although there were other officers on the scene with guns, O'Donnell testified that he talked to Defendant inside the apartment, and that only he and Officer Hall were in the apartment.

Defendant was not removed from the apartment, taken to the ground, or handcuffed until after he made his statement. Therefore, Defendant was not in custody when he made his statement, and the statement will not be suppressed.

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

(1) Magistrate Judge Graham's May 22, 2007 Report and Recommendation is **MODIFIED IN PART and ADOPTED IN PART;**

(2) The May 22, 2007 Report and Recommendation is **MODIFIED** as to the first two sentences of the fourth paragraph in the Background Section of the Report and Recommendation. The sentences are stricken, and the following sentence is inserted in their place: "The apartment door to the other apartment facing the street was opened by a black man in a white tee shirt and jeans, who was later identified as Lafayette Van, the defendant in this matter."

(3) The May 22, 2007 Report and Recommendation is **ADOPTED IN ALL OTHER RESPECTS**;

(4) Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 15] is **DENIED**;

(5) Defendant's Motion to Suppress Statements, Admissions, and Answers [Doc. No. 16] is **DENIED**; and

(6) Defendant's Motion to Suppress the Statement Made in the Hallway

of the Apartment [No Doc. No.] is **DENIED**.

Dated: July 25, 2007

                                                        s/Michael J. Davis
                                                        Michael J. Davis
                                                        United States District Court